## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Dwight Jorgensen et al.,

     Petitioners,

v.

B. Birkholz, et al.,

     Respondents.

Case No. 20-cv-2349 (NEB/DTS)

**REPORT AND RECOMMENDATION**

---

"Habeas corpus is an extraordinary remedy," *Ex parte Simon*, 208 U.S. 144, 148 (1908), and Petitioners indeed seek extraordinary relief. Petitioners Dwight Jorgensen and Paxton Anderson are incarcerated at the Federal Prison Camp in Duluth, Minnesota (FPC-Duluth). Their petition invites the Court to obtrude in "the difficult and delicate problems of prison management." *Thornburgh v. Abbott*, 490 U.S. 401, 407–08 (1989). The Bureau of Prisons (BOP) denied Petitioners' request for transfer to home confinement; they now request that the Court impose its judgment over the BOP's discretionary decision and order the BOP to do so.

To support their request, Petitioners allege the COVID-19 pandemic has engendered such unconstitutional conditions in violation of the Eighth Amendment that the Court should award sweeping injunctive relief at FPC-Duluth, namely ordering the mass transfer of older or medically vulnerable inmates to home confinement. Specifically, they allege that prison officials' failure to implement adequate safeguards against COVID-19 constitutes an Eighth Amendment violation because their age and underlying medical conditions increase their risk of contracting SARS-CoV-2 and their morbidity or mortality rate if contracted. Petitioners' request for habeas corpus relief is improper and this Court

is without jurisdiction to issue such a writ. Though their claim is proper as a civil rights action, even construing their petition in that posture they have failed to plead facts justifying the preliminary injunction they seek, so the Court recommends that it be denied.

**FINDINGS OF FACT**

**I.   COVID-19[1]**

COVID-19 is an infectious disease caused by the SARS-CoV-2 virus, a novel coronavirus strain. Its global spread has caused the ongoing pandemic and the following number of infections or deaths:[2]

|  | Infections | Deaths | Case Fatality Ratio |
|---|---|---|---|
| Globally | 110,174,357 | 2,436,774 | 2.21% |
| United States | 27,876,858 | 492,302 | 1.77% |
| Minnesota | 468,974 | 6,472 | 1.38% |
| St. Louis County | 14,555 | 261 | 1.79% |
| FPC-Duluth | 210 (Total) 20 (Staff) 190 (Inmates) | 0 (Total) 0 (Staff) 0 (Inmates) | 0% (Total) 0% (Staff) 0% (Inmates) |

COVID-19 is a respiratory disease with variable health effects ranging from those who are asymptomatic to death.[3] Its primary mode of transmission is through respiratory droplets, meaning that it passes between persons in close contact through—for

---

[1] Because SARS-CoV-2 is a novel virus, public health and medical research about COVID-19 is rapidly changing. Some of the information Petitioners present in their Petition has since become outdated. Thus, the Court takes judicial notice of current COVID-19 data and this section reflects current public health information and recommendations. *Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 793 (8th Cir. 2016) (recognizing authority to take judicial notice of government websites); *e.g.*, *In re RFC and ResCap Liquidating Tr. Action*, 444 F. Supp. 3d 967, 969 & n.1 (D. Minn. 2020) (taking judicial notice of COVID-19 data from CDC).

[2] Johns Hopkins University, *Coronavirus Resource Center* (Feb. 18, 2021), https://coronavirus.jhu.edu/map.html; Federal Bureau of Prisons, *COVID-19 Facility Data* (Feb. 18, 2021), http://www.bop.gov/coronavirus.

[3] Ctrs. for Disease Control and Prevention, *Fact Sheet for Healthcare Providers* (Dec. 1, 2020).

example—coughing, sneezing, or talking.[4] It is also possible that SARS-CoV-2 spreads through contact, such as touching a surface contaminated by virions, though this mode is less prevalent.[5]

The Centers for Disease Control and Prevention (CDC) advises three ways to slow the spread of COVID-19: wear a mask, stay at least six feet apart from others, and avoid crowds.[6] The CDC also advises practicing basic hygiene, such as frequent handwashing, covering coughs and sneezes, and cleaning often-touched surfaces.[7] The handwashing guidance promotes soap and water as the preferred method, though notes alcohol-based hand sanitizers are an acceptable alternative if soap and water are unavailable.[8] The CDC's guidance does not change for those living in shared housing.[9]

Certain populations are at increased risk for developing severe complications from COVID-19; these groups include older adults and individuals with certain medical conditions.[10] Obesity and Type 2 diabetes are among the medical conditions correlated with an increased risk for severe COVID-19 symptoms. Other conditions, like

---

[4] Ctrs. for Disease Control and Prevention, *Scientific Brief: SARS-CoV-2 and Potential Airborne Transmission* (Oct. 5, 2020), https://www.cdc.gov/coronavirus/2019-ncov/more/scientific-brief-sars-cov-2.html.

[5] Ctrs. for Disease Control and Prevention, *How COVID-19 Spreads* (Oct. 28, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html.

[6] Ctrs. for Disease Control and Prevention, *How to Protect Yourself & Others* (Jan. 30, 2021), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html.

[7] *Id.*

[8] *Id.*

[9] Ctrs. for Disease Control and Prevention, *Living in Shared Housing* (Oct. 28, 2020), https://www.cdc.gov/coronavirus/2019-ncov/daily-life-coping/shared-housing/index.html.

[10] Ctrs. for Disease Control and Prevention, *Evidence used to update the list of underlying medical conditions that increase a person's risk of severe illness from COVID-19* (Nov. 2, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/evidence-table.html.

hypertension and non-COPD chronic lung diseases, may increase risk for severe illness but there is not currently enough data to establish a link.[11]

The CDC recognizes that incarcerated persons are a vulnerable population at increased risk for COVID-19 and offers guidance tailored to correctional and detention facilities.[12] Much of this guidance recommends implementing CDC's individual hygiene recommendations or modifying facility policies or procedures to encourage social distancing, increase sanitation, and limit disease transmission.[13] That said, the BOP has administered more than forty thousand doses of the COVID-19 vaccine.[14]

## II.  Petitioners' Backgrounds

Both Jorgensen and Anderson are incarcerated at FPC-Duluth. They are middle-aged men who suffer from various medical conditions which the CDC recognizes as comorbidities for COVID-19.

Jorgenson is 52 years old. He claims that he is pre-diabetic and suffers from obesity, hypertension, high cholesterol, gout, and "lung conditions."[15] Pet. 2; Jorgensen

---

[11] *Id.*

[12] Ctrs. for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (Dec. 31, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

[13] *Id.*

[14] Ctrs. for Disease Control and Prevention, *COVID-19 Vaccinations in the United States* (Feb. 8, 2021), https://covid.cdc.gov/covid-data-tracker/#vaccinations.

[15] Jorgensen's alleged medical conditions are inconsistent between the Petition and his declaration. The Petition describes him as having obesity, hypertension, high cholesterol, and "lung conditions," while his declaration also lists him being pre-diabetic and having gout. *Compare* Pet. 2, *with* Jorgensen Decl. ¶ 8, Dkt. No. 1-1.

4

Decl. ¶ 8. Anderson is 49 years old and suffers from Type 2 diabetes, high cholesterol, and obesity.[16] Pet. 3; Anderson Decl. ¶ 3.

## III. Petitioners' Suit

### A. Original Petition, 20-cv-1324 (PJS/BRT)[17]

Anderson originally petitioned for a writ of habeas corpus in June 2020. Pet., Dkt. No. 1. He amended that petition two days later. Am. Pet., Dkt. No. 4. After nearly two months, Anderson had neither paid his filing fee nor communicated with the court, so it recommended that his petition be dismissed without prejudice under Rule 41(b) for failure to prosecute. R&R, Dkt. No. 6. In mid-October, Anderson moved to voluntarily dismiss his case under Rule 41(a); Pet. Dismiss, Dkt. No. 7; which the District Court granted; Order, Dkt. No. 8.

### B. Present Petition, 20-cv-2349 (NEB/DTS)

Anderson refiled his petition with Jorgensen in November 2020 as a class action petition for habeas corpus on behalf of a purported class of all prisoners at FPC-Duluth. Pet. ¶¶ 9–10, Dkt. No. 1. They also sought to represent a subclass of:

> all individuals in custody at FPC Duluth or will become in custody at FPC Duluth during the course of the COVID-19 pandemic who are aged 50 or over and/or who have serious underlying medical conditions that put them at particular risk of serious harm or death from COVID-19, including but not limited to people with respiratory conditions such as chronic lung disease or asthma; people with heart disease or other heart conditions; people who are immunocompromised as a result of cancer, HIV/AIDS, or for any other reason; people with chronic liver or kidney disease, or any renal failure (including hepatitis and dialysis patients); people with Type I and II diabetes, epilepsy, hypertension, obesity (BMI 30+), blood disorders (including sickle cell disease), or an inherited metabolic disorder; people who have had or

---

[16] Anderson's medical conditions are similarly inconsistent. The Petition states that he suffers only from obesity and Type 2 diabetes but his declaration also lists high cholesterol. *Compare* Pet. 3, *with* Anderson Decl. ¶ 3, Dkt. No. 1-2.

[17] All citations in this subsection relate to Case No. 20-cv-1324.

> are at risk of stroke; and people with any condition specifically identified by
> CDC, currently or in the future, as increasing their risk of contracting, having
> severe illness, and/or dying from COVID-19.

Pet. ¶ 11. In a previous order this Court addressed the preliminary issue that Petitioners, as pro se litigants, cannot maintain a class action. Order, Dkt. No. 9. The Court has since construed Petitioners' action as one brought by Jorgensen and Anderson individually.

Petitioners allege that the conditions of confinement at FPC-Duluth, namely its alleged noncompliance with CDC COVID-19 recommendations, violates the Eighth Amendment. Pet. ¶¶ 6–7, 260, 262, 266. Petitioners portray the conditions at FPC-Duluth as deficient—even "inhumane." Pet. ¶ 16. They allege they are at a much higher risk for contracting COVID-19, Pet. ¶ 25, and their medical conditions coupled with that increased risk create "a grave risk that [they] will not make it out of FPC Duluth alive or will become terribly ill," Pet. ¶ 29. From Petitioners' perspective, FPC-Duluth has taken no steps to prevent the proliferation of COVID-19: For example, the hand sanitizer contains no alcohol and is no longer sold at the commissary. Pet. ¶¶ 45, 64, 166, 219. The inmate density is too great and the beds are too close, preventing proper social distancing. Pet. ¶¶ 43, 45, 62, 78, 204. The ventilation system is inadequate. Pet. ¶¶ 43, 62, 96, 229. There is no contact tracing, daily temperature check, or regular COVID-19 testing.[18] Pet. ¶¶ 49–50, 57, 70A, 73, 76, 196.

Petitioners list several changes that FPC-Duluth *has* implemented to respond to COVID-19: it has reduced dormitory unit occupancy by fifty percent. *See* Pet. ¶ 62. There are handwashing stations. Pet. ¶ 64. It has activated previously-empty dorms to create

---

[18] This pleading conflicts with Petitioners' memorandum supporting their motion for a TRO, where they state that "symptom-based testing alone is used at Duluth FPC with temperatures 'occasionally' taken." TRO Mem. 1, Dkt. No. 5.

an isolation unit. Pet. ¶ 67. Individuals transferring into or returning to FPC-Duluth are quarantined. Pet. ¶ 67. It has adjusted dorm designations to align housing and work assignments. TRO Mem. 20, Dkt. No. 5. And it is reviewing inmates to determine suitability for home confinement. Resp. 7, Dkt. No. 10.

Petitioners ask this court for mixed relief. First, they ask the Court to issue a writ of habeas corpus ordering Petitioners' transfer to home confinement.[19] Pet. 47–49. Second, they ask the Court to retain jurisdiction to enforce any injunctive relief it orders. Pet. 49.[20] Finally, they seek a TRO and preliminary injunction requiring FPC-Duluth to "de-densify" its population by transferring Petitioners to home confinement. TRO Mem. 4,

---

[19] Petitioners' 100-page petition accentuates that they seek transfer to home confinement. Yet they use transfer and release interchangeably throughout the petition. *Compare* Pet. ¶¶ 78, 191–92 ("release to home confinement"), *with* Pet. ¶¶ 179, 189–90, 193, 237D, 240 (phrasing as "transfer" to home confinement). The Court recognizes that one can simultaneously be released from prison and transferred to home confinement. Release, however, is a habeas corpus term of art meaning liberated from any restraint on liberty—released from all custody.

In an isolated instance Petitioners request "immediate release from custody *or* . . . transfer to home confinement," two distinct forms of relief. Pet. 47 (emphasis added). A request for complete release deviates from their entire Petition and is relief this Court cannot award. *Brown v. Plata*, 563 U.S. 493, 500 (2011) ("The authority to order release of prisoners as a remedy to cure a systemic violation of the Eighth Amendment is a power reserved to a three-judge district court, not a single-judge district court."); *see* 18 U.S.C. § 3626(a)(3)(A)(i)–(ii) ("[N]o court shall enter a prisoner release order unless . . . a court has previously entered an order for less intrusive relief that has failed to remedy the deprivation of the Federal right," and defendants have "had a reasonable amount of time to comply with the previous court orders."); 18 U.S.C. § 3626(a)(3)(B) ("[A] prisoner release order shall be entered only by a three-judge court . . . .").

Consistent with the rest of their Petition, the Court therefore construes this isolated request for relief as one requesting only transfer to home confinement.

[20] Petitioners also seek injunctive relief ensuring FPC-Duluth's compliance with various CDC COVID-19 guidelines. Pet. 47–49. That relief, however, relates only to the purported class not transferred to home confinement. Because Petitioners cannot maintain their suit as a class action, the requested class relief that does not apply to Petitioners is irrelevant. It is also unclear whether Petitioners' request that the Court retain jurisdiction pertains to all requested relief (injunctive relief and transfer to home confinement) or to the class injunctive relief only.

Dkt. No. 5. This remedy—"remov[ing] them from the prison <u>before</u> they contract the virus"—is, they allege, "the only way to protect against the imminent risk of substantial harm and possible death for . . . prisoners who are most vulnerable to the virus." TRO Mem. 24.

## CONCLUSIONS OF LAW

For nearly a year, COVID-19 has posed a global threat to health and safety, including to those residing in congregate living facilities, such as correctional institutions or long-term care facilities. Recognizing the threat linked to congregate living, and tracking CDC guidance to social distance, many state and federal agencies implemented policies to reduce intrafacility population density, maximize social distancing and segregation, and obstruct the transmission of SARS-CoV-2. Still, many incarcerated persons believe those COVID-19-related policy changes are inadequate and choose to bring legal challenges.[21] Courts have struggled to resolve whether habeas corpus or civil rights actions are the proper mechanism to litigate claims that "confinement itself is the unconstitutional 'condition of confinement'[.]" *Essien v. Barr*, 457 F. Supp. 3d 1008, 1013 (D. Colo. 2020).

Claims alleging prison conditions are unconstitutional are properly litigated as civil rights actions under 42 U.S.C. § 1983 or *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). *Farmer v. Brennan*, 511 U.S. 825, 845–46 (1994). In that posture, courts can 'right the wrong' by awarding damages or issuing

---

[21] Burton Bentley II, *The Growing Litigation Battle Over COVID-19 in the Nation's Prisons and Jails*, Law.com, Aug. 25, 2020, https://www.law.com/2020/08/25/the-growing-litigation-battle-over-covid-19-in-the-nations-prisons-and-jails/?slreturn=20210103173511.

injunctions to prohibit future unconstitutional conduct. Habeas corpus, by contrast, is a "procedural device for subjecting executive, judicial, or private restraints on liberty to judicial scrutiny. Where it is available, it assures among other things that a prisoner may require his jailer to justify the detention under the law." *Peyton v. Rowe*, 391 U.S. 54, 58 (1968). When the fact or duration of confinement is unconstitutional, courts can order "'immediate or speedier release' from confinement." *Skinner v. Switzer*, 562 U.S. 521, 525 (2011) (quoting *Wilkinson v. Dotson*, 544 U.S. 74, 82 (2005)).

There are two fundamental distinctions between civil rights actions and habeas corpus petitions. First, civil rights actions challenge the constitutionality of some condition of confinement or method of executing a custodial sentence, while habeas petitions dispute the constitutionality of the fact or duration of the sentence itself. Second, civil rights actions—generally—do not terminate confinement but compensate for or alleviate the unconstitutional condition. Habeas corpus provides a mechanism to end the allegedly unconstitutional restraint on liberty in its entirety.

From one perspective, Petitioners Eighth Amendment claim appears appropriate as a civil rights action—they allege the conditions at FPC-Duluth violate the Constitution and, aside from COVID-19, do not contend that their sentence of imprisonment is unconstitutional. But from another perspective, Petitioners allege that their continued confinement at the prison camp is unconstitutional because the conditions are so hazardous that no lesser remedy could cure the constitutional violation. Thus, they challenge the fact of their confinement at the prison camp.

Because much of the COVID-19 litigation is legally and factually analogous to different aspects of both civil rights and habeas corpus litigation, courts have not uniformly

determined which action is proper, which has led to conflicting judicial guidance and reasoning. *Compare Toure v. Hott*, 458 F. Supp. 3d 387, 400 (E.D. Va. 2020) (finding habeas improper and detailing "reasons to believe the Fourth Circuit would . . . hold § 2241 [a]s an inappropriate means to challenge one's conditions of confinement"), *with Wilson v. Williams*, 455 F. Supp. 3d 467, 475 (N.D. Ohio 2020) ("Whereas many medical needs claims might appropriately be addressed through § 1983 litigation, claims concerning COVID-19 are not so easily classified as § 1983 claims."), *vacated on other grounds* 961 F.3d 829 (6th Cir. 2020), *and Money v. Pritzker*, 453 F. Supp. 3d 1103, 1119 (N.D. Ill. 2020) (recognizing "the unique context in which litigation over COVID-19 arises . . . because the sudden threat to mortality from the spread of virus in a congregate setting may affect the fact or duration of confinement"). Even decisions within this District have taken conflicting views. *Compare Malcolm v. Starr*, No. 20-cv-2503 (MJD/LIB), 2021 WL 190870 (D. Minn. Jan. 15, 2021), *with Angelica C. v. Immigr. and Customs Enf't*, No. 20-cv-913 (NEB/ECW), 2020 WL 3441461 (D. Minn. June 5, 2020), *report and recommendation adopted* 2020 WL 3429945 (D. Minn. June 23, 2020), *and Mohammed S. v. Tritten*, No. 20-cv-793 (NEB/ECW), 2020 WL 2750836 (D. Minn. April 28, 2020), *report and recommendation adopted* 2020 WL 2750109 (D. Minn. May 27, 2020).

## I.  Habeas Corpus

### A.  Legal Standard

The writ of habeas corpus is a mechanism to hold the government accountable for resisting unjustified or unlawful detention. *Ex parte McCardle*, 73 U.S. (6 Wall.) 318, 325–26 (1867). Habeas corpus is the exclusive means to assess claims that "go[] directly to the constitutionality of [a prisoner's] physical confinement itself"; allowing them to "seek[]

either immediate release from that confinement or the shortening of its duration." *Preiser v. Rodriguez*, 411 U.S. 475, 489 (1973); *see* 42 U.S.C. § 2241(c)(3).

Under 28 U.S.C. § 2241(c), habeas jurisdiction "shall not extend to a prisoner unless . . . [h]e is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). Thus, for a federal court to have subject matter jurisdiction over a petition for the writ of habeas corpus, the petitioner must be "in custody," and second, that custody itself must violate "the Constitution or laws or treaties of the United States." *Id.*; *Maleng v. Cook*, 490 U.S. 488, 490 (1989).

But "[i]f the prisoner is not challenging the validity of his conviction or the length of his detention, such as loss of good time, then a writ of habeas corpus is not the proper remedy." *Kruger v. Erickson*, 77 F.3d 1071, 1073 (8th Cir. 1996) (per curiam); *see Muhammad v. Close*, 540 U.S. 749, 750 (2004) (per curiam) (identifying two types of claims properly pursued through habeas: "[c]hallenges to the validity of any confinement or to particulars affecting its duration"). Instead, claims challenging conditions of confinement are proper as civil rights claims under 42 U.S.C. § 1983 or as a *Bivens* action. *Nelson v. Campbell*, 541 U.S. 637, 643 (2004).

**B. Challenges to Conditions of Confinement**

Conditions of confinement claims are not cognizable under habeas corpus. "Where [a] petitioner seeks a writ of habeas corpus and fails to attack the validity of his sentence or the length of his . . . custody, the district court lacks the power or subject matter jurisdiction to issue a writ." *Kruger*, 77 F.3d at 1073; *accord Spencer v. Haynes*, 774 F.3d 467 (8th Cir. 2014). Constitutional challenges to conditions of confinement claims must be litigated as civil rights actions. *Muhammad*, 540 U.S. at 750 ("Challenges to the validity

of any confinement or to particulars affecting its duration are the province of habeas corpus . . .; requests for relief turning on circumstances of confinement may be presented in a civil rights action."); *Nelson*, 541 U.S. at 643 ("[C]onstitutional claims that merely challenge the conditions of a prisoner's confinement, whether the inmate seeks monetary or injunctive relief, fall outside th[e] core [of habeas corpus] and may be brought pursuant to § 1983 in the first instance.").

### C. The Seventh Circuit's Approach

The Seventh Circuit has developed precedent permitting habeas actions for incarcerated persons seeking "a quantum change in the level of custody—whether outright freedom, or freedom subject to the limited reporting and financial constraints of bond or parole or probation." *Graham v. Broglin*, 922 F.2d 379, 381 (7th Cir. 1991). Though certain Justices of the United States Supreme Court have endorsed this framework, the Court itself has not adopted it. *See Wilkinson v. Dotson*, 544 U.S. 74, 86 (2005) (Scalia, J., concurring) (recognizing "quantum change" framework). Nor has the Eighth Circuit adopted this standard and courts in this District have not fully embraced *Graham*'s holding. *Compare Silva v. Paul*, No. 18-cv-2177 (ECT/ECW), 2019 WL 542945, at *5–6 (D. Minn. Jan. 7, 2019) (finding that while placement in halfway house creates quantum change in level of custody, denial of vocational programs does not), *report and recommendation adopted* 2019 WL 536668 (D. Minn. Feb. 11, 2019), *with Bania v. Royal*, No. 11-cv-925 (SRN/TNL), 2011 WL 7945547, at *3 (D. Minn. Oct. 24, 2011) (finding "[Residential Reentry Center] placement decisions implicate the fact or duration of confinement" to permit a habeas challenge), *report and recommendation adopted* 2012 WL 1886485 (D. Minn. May 23, 2012).

More importantly, the Seventh Circuit's "quantum change" framework has a less-cited limitation: "if [the petitioner] is seeking a different program or location or environment, then he is challenging the conditions rather than the fact of his confinement and his remedy is under civil rights law, even if, as will usually be the case, the program or location or environment he is challenging is more restrictive than the alternative he seeks." *Graham*, 922 F.2d at 381. That limitation coincides with the Eighth Circuit's recognition that home confinement is not release, but is a "transfer" of the location of imprisonment. *See Elwood v. Jeter*, 386 F.3d 842, 847 (8th Cir. 2004) (describing *transfer* to home confinement as a *pre-release* condition).

### D.  Recent District of Minnesota Decisions

Courts in this District have three times ruled on petitions seeking habeas corpus related to COVID-19 detention. In two, the petitioners were ICE detainees and sought release from detention pending immigration proceedings. *Angelica C. v. Immigr. and Customs Enf't*, No. 20-cv-913 (NEB/ECW), 2020 WL 3441461 (D. Minn. June 5, 2020), *report and recommendation adopted* 2020 WL 3429945 (D. Minn. June 23, 2020); *Mohammed S. v. Tritten*, No. 20-cv-793 (NEB/ECW), 2020 WL 2750836 (D. Minn. April 28, 2020), *report and recommendation adopted* 2020 WL 2750109 (D. Minn. May 27, 2020) ["ICE detention cases"]. The third petition was a class action challenging confinement in a federal prison and sought transfer to home confinement. *Malcolm v. Starr*, No. 20-cv-2503 (MJD/LIB), 2021 WL 190870 (D. Minn. Jan. 15, 2021).

In the ICE detention cases the petitioners were undocumented foreign nationals requesting release from detention. Neither Mohammad S. nor Angelica C. were serving a criminal sentence, but their detention ensured their appearance at future immigration

proceedings. The District Court distinguished that scenario from *Spencer* because the petitioners alleged that nothing short of their release could lessen the danger they faced from COVID-19 while detained. The petition in *Spencer*, by contrast, did not seek release from prison but alleged that the prolonged use of four-point restraints violated the Eighth Amendment. *Spencer*, 774 F.3d at 469. The court's analysis in the ICE detention cases focused on the petitioners' requested relief—release from detention—and the court found that petitioners' challenge was to the detention itself, not the conditions that COVID-19 caused. *Angelica C.*, 2020 WL 3441461, at *10–11; *Mohammad S.*, 2020 WL 3441461, at *19. Thus, in finding that the petitioners' habeas claim was appropriate, the petitioners' requested relief—release—weighed more heavily on the court's analysis than did the impetus for their petition.

Unlike the ICE detention cases, the court in *Malcolm* found that the petitioners' request for habeas corpus relief was inappropriate. There, the petitioners were a class of incarcerated persons at FCI-Waseca seeking transfer to home confinement. They too alleged that COVID-19 caused unsafe and unconstitutional conditions at the facility where they were incarcerated. The Court, however, relied on *Spencer* to find that it lacked jurisdiction over their habeas corpus petition because they challenged their conditions of confinement, not their sentence of incarceration. *Malcolm*, 2021 WL 190870, at *4–6. Though petitioners in all three cases alleged their confinement conditions were unsafe from the risks associated with COVID-19, notably different in *Malcolm* was that the petitioner did not request complete release, as in the ICE detention cases, but *transfer* to home confinement. As discussed, while transfer to home confinement may include a release from prison, it is not release from BOP custody and an individual serving a

sentence of home confinement is still not free of all restraints on liberty. Thus, the relief Malcolm sought was vastly different from the relief in the ICE detention cases.

### E. Analysis

Habeas corpus is not the proper means to address Petitioners' grievances. They do not challenge the validity of their confinement but instead seek an order modifying their level of custody because of the conditions of their confinement. Nor do they allege that their detention at FPC-Duluth is, or in home confinement would be, improper. Instead, it is the purportedly unconstitutional *conditions of confinement* specifically at FPC-Duluth,[22] which Petitioners tender to justify their transfer. As other federal district courts have recognized, but for conditions arising from COVID-19, Petitioners' claims would not exist. *E.g.*, *Alvarez v. Larose*, 445 F. Supp. 3dd 861, 866 (S.D. Cal. 2020); *Wragg v. Ortiz*, 462 F. Supp. 3d 476, 484 (D.N.J. 2020). Because Petitioners raise no challenge to the validity of their sentence—whether served in FPC-Duluth, home confinement, or elsewhere—and their claims stem from the conditions of their confinement at FPC-Duluth, habeas corpus is improper. Petitioners' entire petition alleges that FPC-Duluth has created unconstitutional conditions by failing to implement certain safeguards against COVID-19—the heart of their claim does challenge not their incarceration but the conditions in which they are incarcerated.

This determination aligns with *Mohammad S.*, *Angelica C.*, and *Malcolm*. Unlike the ICE detention cases, Petitioners here do not seek unconditional release from prison.

---

[22] That the conditions are specific to a particular prison highlights the flaw in Petitioners' approach. Though they have not requested it, the theory of Petitioners' relief request would be satisfied by transfer to a different BOP facility with more robust COVID-19 precautions.

Instead, as in *Malcolm*, they ask the Court to order their transfer to home confinement. Petitioners were also criminally charged and sentenced to their term of imprisonment, like Malcolm, not detained pending a civil immigration hearing. The sentencing judge determined their incarceration was necessary based on the seriousness of their offenses, to promote respect for law and provide just punishment, to deter criminal conduct, and to protect the public. 18 U.S.C. § 3553(a).

Petitioners have also not alleged that their transfer to home confinement is the only means to reduce their risks; it is merely their preferred outcome. Their petition focuses on the need for FPC-Duluth to "de-densify"—meaning reduce its incarcerated population so that it can properly implement social distancing policies. FPC-Duluth could assuage Petitioners' risk by releasing *other* inmates to home confinement or implementing other policies. Thus, while their ideal remedy is to transfer them to home confinement, *their* transfer is not the only remedy available to cure their alleged-constitutional injury.

Thus, the Court lacks subject matter jurisdiction to consider Petitioners' § 2241 claim for allegedly unconstitutional conditions of confinement at FPC-Duluth and their petition must be denied. *Spencer*, 774 F.3d at 471. They must, however, have a chance to "convert[] their claims from a habeas proceeding to a [civil rights] action." *Id.*

### F. Proper Posture as a Civil Rights Action

Though the Court finds it lacks subject matter jurisdiction for Petitioners' habeas corpus petition, jurisdiction would be proper in a civil rights action. In determining the current posture of Petitioners' litigation is improper, the Court must ensure that Petitioners have some proper mechanism available to pursue their Eighth Amendment claim. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803) ("The government of the United

States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right."); 3 William Blackstone, Commentaries *23 ("[I]t is a general and indisputable rule, that where there is a legal right, there is also a legal remedy, by suit or action at law, whenever that right is invaded.").

Much of the precedent discussed above describes conditions-of-confinement-claims improperly brought under habeas corpus as proper claims under 42 U.S.C. § 1983 or under *Bivens*. Petitioners suit, however, cannot proceed under either of those causes of action: Section 1983 claims are only cognizable against a state entity. 42 U.S.C. § 1983 (requiring action under color of state law). *Bivens* actions permit individual capacity suits for damages against federal officers for a narrow class of constitutional violations. *Bivens*, 403 U.S. at 389 (holding that the Constitution creates a cause of action for money damages). Petitioners are neither suing state officers nor seeking money damages, so neither § 1983 nor *Bivens* provide Petitioners a route to a remedy. That said, "federal district courts . . . have jurisdiction over claims by federal prisoners against federal prison officials seeking vindication of their constitutional rights under either 28 U.S.C. § 1331 or 28 U.S.C. § 1361, and may obtain relief in the nature of either injunction or mandamus." *Simmat v. U.S. Bureau of Prisons*, 413 F.3d 1225, 1236 (10th Cir. 2005).

Section 3626 of Title 18 likewise permits prisoners to seek prospective injunctive relief for claims of unconstitutional conditions of confinement. 18 U.S.C. § 3626. Though § 3626 operates more as a limitation on the relief federal courts can provide, it implicitly authorizes federal prisoners to seek the relief Petitioners seek here. 18 U.S.C. § 3626(a)(1).

Thus, whether Petitioners' cause of action arises from the "inherent authority to issue injunctive relief that emanates from § 1331" or some other statute, such as § 3626, Petitioners can bring their Eighth Amendment claim seeking prospective injunctive relief as a civil action. *Taylor v. Rice*, No. 10-4746 (SRN/JJG), 2012 WL 246014, at *8 (D. Minn. Jan. 6, 2012); *accord Woody v. United States Bureau of Prisons*, No. 16-cv-862 (DWF/BRT), 2016 WL 7757523, at *4 (D. Minn. Nov. 22, 2016); *Vazquez v. Nagel*, No. 10-cv-4217 (JNE/TNL), 2012 WL 1593199, at *8 n.9 (D. Minn. Feb. 13, 2012).

## II.  Temporary Restraining Order & Preliminary Injunction

The Government presents several theories about why the Court has no jurisdiction to reach the merits of Petitioners' claim or cannot assess the BOP's discretionary decision, but "Courts cannot blithely defer to the supposed expertise of prison officials when it comes to the constitutional rights of inmates." *Wolff v. McDonnell*, 418 U.S. 539, 599 (1974).

The Eighth Circuit has instructed courts to liberally construe civil rights actions improperly filed as habeas petitions, allowing petitioners the option to have the court construe their petition as a complaint. *Spencer*, 774 F.3d at 471. Though Petitioners have not yet made that election, given the urgency afforded TROs and preliminary injunctions, the Court will—for this analysis only—assume Petitioners would make that request. Petitioners moved for a temporary restraining order and a preliminary injunction requesting that the Court grant immediate relief to protect them against the substantial risk of COVID-19 while incarcerated at FPC-Duluth by ordering their immediate transfer to home confinement. Mot., Dkt. No. 4.

Federal courts may issue an *ex parte* TRO only if "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1). Likewise, courts "may issue a preliminary injunction only on notice to the adverse party." Fed. R. Civ. P. 65(a)(1). Though slight, the distinction rests on notice to the adverse party. Petitioners request that the Court issue both, but since the Government has responded, it has had notice. Resp. 24–25, Dkt. No. 10. Because Courts apply the same legal standard for issuing a TRO or a preliminary injunction, *Izabella HMC-MF, LLC v. Radisson Hotels Int'l, Inc.*, 378 F. Supp. 3d 775, 777–78 & n.2 (D. Minn. 2019), and because the facts align more with a preliminary injunction, the Court construes Petitioners motion for a TRO and preliminary injunction as one seeking only a preliminary injunction. *See Carlson v. City of Duluth*, 958 F. Supp. 2d 1040, 1052 n.1 (D. Minn. 2013) (construing ambiguous TRO/preliminary injunction motion as one for a preliminary injunction because defendant had notice and filed opposition brief).

### A. Legal Standard

Courts assess four factors when determining whether to issue a preliminary injunction:

> (1) the likelihood of the movant's success on the merits;
>
> (2) the threat of irreparable harm to the movant in the absence of relief;
>
> (3) the balance between that harm and the harm that the relief would cause to the other litigants; and
>
> (4) the public interest

*Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981)). "While no single factor is determinative,

the probability of success factor is the most significant." *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013). "If a party's likelihood of succeeding on the merits is sufficiently low, a court may deny a preliminary injunction even if the other three factors— irreparable harm, balance of harms, and the public interest—weigh in the [moving] party's favor." *McMahon v. Delta Air Lines, Inc.*, 830 F. Supp. 2d 674, 688 (D. Minn. 2011). Though the 'success on the merits' factor does not require the moving party to prove their probability of prevailing is more likely than not, *Dataphase*, 640 F.2d at 113, the movant must show a "fair chance of prevailing" on the merits, *Kroupa v. Nielsen*, 731 F.3d 813, 818 (8th Cir. 2013).

Even if success on the merits is likely, however, "preliminary injunctive relief is improper absent a showing of a threat of irreparable harm." *Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 706 (8th Cir. 2011). In the preliminary injunction context, a party establishes irreparable harm by showing "that a cognizable danger—more than a 'mere possibility'—exists of a future violation." *C.H. v. Sullivan*, 718 F. Supp. 726, 730 (D. Minn. 1989). The moving "party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Roudachevski*, 648 F.3d at 706 (quoting *Iowa Utils. Bd. v. Fed. Commc'ns Comm'n*, 109 F.3d 418, 425 (8th Cir. 1996)).

Above all, courts must consider that "preliminary injunction[s] [are] an extraordinary remedy," *Watkins, Inc.*, 346 F.3d at 844, issued only "to preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the lawsuit's merits," *Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994) (per curiam). The extraordinary nature of a preliminary injunction is especially significant in "the prison context, [where] a

request for injunctive relief must always be viewed with great caution because 'judicial restraint is especially called for in dealing with the complex and intractable problems of prison administration.'" *Goff v. Harper*, 60 F.3d 518, 520 (8th Cir. 1995) (quoting *Rogers v. Scurr*, 676 F.2d 1211, 1241 (8th Cir. 1982)).

### B.  Analysis

Nothing in the record supports a conclusion that Petitioners are likely to succeed on the merits of their Eighth Amendment claim, even as civil rights action. "The Constitution does not mandate comfortable prison conditions, but neither does it permit inhumane ones, and . . . the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). The Eighth Amendment requires prison officials to provide "humane conditions of confinement" to safeguard incarcerated persons' health and safety. *Id.* at 832, 837. To show a violation, inmates must establish that they faced "a substantial risk of serious harm" and that "prison official[s] [were] deliberately indifferent to that risk." *Vandevender v. Sass*, 970 F.3d 972, 975 (8th Cir. 2020). Whether the inmate faced a substantial risk is an objective inquiry, but whether officials were deliberately indifferent is a subjective one. *Id.* That subjective inquiry assesses whether the prison officials knew of the risk and disregarded it, *id.*, proof of which requires "showing of a mental state 'akin to criminal recklessness,'" *Roberts v. Kopel*, 917 F.3d 1039, 1042 (8th Cir. 2019) (quoting *Roberson v. Bradshaw*, 198 F.3d 645, 647 (8th Cir. 1999). "[D]eliberate indifference is an extremely high standard" to meet, *Saylor v. Nebraska*, 812 F.3d 637, 644 (8th Cir. 2016), because "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded

reasonably to the risk, *even if the harm ultimately was not averted*," *Farmer*, 511 U.S. at 844 (emphasis added).

Petitioners base their Eighth Amendment claim on "Respondents' failure to provide adequate medical care in response to a widespread outbreak of a contagious disease," which, they allege, "constitutes deliberate indifference to the serious, known medical needs of detainees, thereby establishing a violation of the Eighth Amendment of the United States Constitution." Pet. ¶ 260. Because the Government neglected to provide any substantive response to the merits of Petitioners' claim, this Court's analysis is limited to the facts Petitioners provided. Even so, the facts Petitioners present do not warrant issuance of a preliminary injunction. Petitioners frame the scenario as if FPC-Duluth has done nothing to mitigate the transmission of SARS-CoV-2. But in alleging that there is no alcohol in the hand sanitizer at the handwashing stations, Petitioners admit that FPC-Duluth has set-up handwashing stations to encourage cleanliness. In claiming that the BOP does not provide free masks, they mention that the BOP, in fact, does provide single layer masks and other masks are available for purchase. Powers Decl. ¶ 14, Dkt. No. 1-2. And in asserting that FPC-Duluth has not taken steps to social distance, they disclose that the facility has reduced its dormitory unit occupancy by fifty percent.[23] Pet. ¶ 62. Thus, FPC-Duluth *has* responded to the risk Petitioners face from COVID-19.

---

[23] Though FPC-Duluth has reduced its occupancy, that reduction does not necessarily establish that it meets CDC's social distancing guidance. The U.S. Department of Justice has calculated that:

> at year-end 2018, the prison custody population in 12 states and the BOP was equal to or greater than their prisons' maximum rated, operational, and design capacity, and 25 states and the BOP had a total number of prisoners

Petitioners focus on what FPC-Duluth has not done: modify ventilation systems, provide free supplies, implement daily temperature checks or prophylactic COVID-19 testing, or—notably—release them to home confinement. That FPC-Duluth has not implemented every possible measure in responding to COVID-19 does not mean its conduct violates Petitioners' Eighth Amendment rights. FPC-Duluth has responded, and this Court finds its response was reasonable.

Many of the "grave risk[s]" Petitioners face are no more grave than the risks faced by those outside FPC-Duluth. *See also United States v. Graham*, 452 F. Supp. 3d 871, 879 (D. Minn. 2020) (collecting cases recognizing risk of COVID-19 is not unique to prisons and may be greater if released into the community). Petitioners note the lack of a vaccine, but many others likewise do not yet have access to the COVID-19 vaccine. Petitioners allege their chronic health conditions and their age increase their chance of severe complications from COVID-19. But so too are large swaths of the non-incarcerated population middle-aged and experience chronic health conditions. Likewise, large populations live in, for example, multi-family housing or homeless shelters, where strict social distancing is impractical. The Court recognizes that Petitioners' age, health, and incarceration changes their risk calculation for COVID-19,[24] but being at an increased risk is not itself an Eighth Amendment violation.

---

in custody that met or exceeded their minimum number of beds across the three capacity measures: design, operational, and rated capacity.

E. Ann Carson, *Prisoners in 2018*, BULL. JUST. STATS., at 25 (Apr. 2020), https://www.bjs.gov/content/pub/pdf/p18/pdf (last visited Feb. 11, 2021).

[24] Kelly Davis, *Coronavirus in Jails and Prisons*, THE APPEAL (Aug. 3, 2020), https://theappeal.org/coronavirus-in-jails-and-prisons-37 (last visited Feb. 11, 2021) ("[O]vercrowded, aging facilities lacking sanitary conditions and where medical care is, at best, sparse; too many older prisoners with underlying illnesses; regular flow of staff,

Petitioners allege that "[t]here is a dangerous, uncontrolled COVID-19 outbreak at FPC Duluth." TRO Mem. 4, Dkt. No. 5. That is inaccurate. FPC-Duluth has one active COVID-19 case—an employee.[25] Much of the justification for Petitioners' claim rests on system-wide BOP data. For example, Petitioners cite statistics from September 2020 describing that "there are 2,080 federal inmates and 703 staff who have confirmed positive test results for COVID-19 nationwide: 133 federal inmates have died and 2 BOP staff member deaths attributable to the disease ha[ve] been reported." *Id.* at 1. They also mention that "coronavirus has been reported in 116 BOP facilities." *Id.* at 4. The Court notes the staggering number of COVID-19 infections and deaths, both within the BOP and throughout the nation or globally. But Petitioners' use of generalized data from an agency with 126 facilities nationwide cannot signal that Petitioners face a specific threat of irreparable harm in FPC-Duluth, especially when FPC-Duluth has had no deaths from COVID-19. The only FPC-Duluth specific data Petitioners provide is that "[w]ithin a 24-hour period, 9 inmates were identified as infected." TRO Mem. 5. Further, while Petitioners do not mention where they would reside if transferred to home confinement, both Saint Louis County and the State of Minnesota have experienced hundreds or thousands of deaths. Again, FPC-Duluth, by contrast, has had none. Whatever measures FPC-Duluth is implementing, those measures have kept its case fatality ratio much lower than what Petitioners would experience if transferred.

---

guards, healthcare workers in and out of facilities—would leave detention facilities, and their surrounding communities, vulnerable to outbreaks.").

[25] Federal Bureau of Prisons, *COVID-19 Facility Data* (Feb. 18, 2021), http://www.bop.gov/coronavirus.

Much of Petitioners' argument also stems from its view that the BOP has not implemented Congress's guidance under the First Step Act, § 3624(c), or the various DOJ directives about COVID-19 and reducing facilities' inmate density by transferring incarcerated persons to home confinement. *E.g.*, TRO Mem. 32–36. Whether FPC-Duluth or the BOP is adhering to Congressional or Agency directives is outside the scope of this analysis and is not, by itself, a violation of the Eighth Amendment. *See Gamez v. Norris*, 742 F. App'x 297, 298 (9th Cir. 2019) (upholding jury instruction stating, "While a violation of Department of Corrections policy may also constitute a violation of an inmate's constitutional rights, you may not simply conclude one follows the other"); *see also* 18 U.S.C. § 3625 (exempting certain BOP actions from judicial review under the APA); *Martin v. Gerlinski*, 133 F.3d 1076, 1079 (8th Cir. 1998) (no jurisdiction to review discretionary BOP decisions).

Petitioners have not pleaded any of the requisite elements of an Eighth Amendment claim and the alleged conduct they plead cannot support one. If Petitioners believe FPC-Duluth's COVID-19 response violates the Eighth Amendment, they must plead facts showing prison officials were deliberately indifferent to the risk they faced. Petitioners have not done that, and thus have not shown they have a "fair chance of prevailing" on the merits. *Kroupa*, 731 F.3d at 818. Nor have they pleaded facts that they face an irreparable harm at FPC-Duluth. For that reason, their request for a preliminary injunction must be denied.

Congress has created a remedy appropriate for the relief Petitioners seek: compassionate release. Not only may Petitioners seek relief through a civil rights action, but, as many other federal inmates have done since the emergence of COVID-19, they

may petition for compassionate release. That request, however, must be presented to and is decided by Petitioners' sentencing judges, not this Court. 18 U.S.C. § 3582(c)(1)(A).

## CONCLUSION

Petitioners' challenge to the conditions of their confinement is improper on a petition for a writ of habeas corpus. That said, they may file a civil rights complaint.[26] With this recommendation, the Government requests that "the case be severed into two separate matters for ease of responding." Resp. 15 n.5, Dkt. No. 10. But also so that "each putative plaintiff would need to submit an application to proceed in forma pauperis and be assessed a filing fee." *Id.* The Court declines to accept that invitation and finds frustrating the Government's attempt to impose on Petitioners other procedural and financial hurdles. The Eighth Circuit's guidance in *Spencer* was clear: construe filings liberally and provide Petitioners with the option to have the Court consider their Petition as a complaint. *Spencer*, 774 F.3d at 471. Nowhere did *Spencer* imply that Petitioners should have to start from scratch. *See id.*

## RECOMMENDATION

For these reasons, IT IS HEREBY RECOMMENDED:

1.  Petitioners' Petition for a writ of habeas corpus under 28 U.S.C. § 2241 [Docket No. 1] be **DISMISSED**.

2.  Petitioners' Motion for a Temporary Restraining Order and Preliminary Injunction [Docket No. 4] be **DENIED**.

---

[26] The Court recommends that the Petitioners refile a complaint rather that construing their petition as one because much of the information in their petition applied only to the class action allegations.

3.  The entry of judgment be stayed for 60 days to allow Petitioners to file a civil rights complaint.


Dated: February 18, 2021                        _s/ David T. Schultz_____
                                                DAVID T. SCHULTZ
                                                United States Magistrate Judge


## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to the magistrate judge's proposed findings and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. *See* Local Rule 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).